WhitakeR, Judge,
delivered the opinion of the court:
Plaintiffs sue for just compensation, alleging that their property has been flooded and that its value for the mining of sodium sulphate has been destroyed as a result of the construction of the O’Sullivan Dam on Lower Crab Creek in the State of Washington. Defendant defends on the ground that the flooding was not the natural and necessary consequence of the construction of the dam, and on the ground that plaintiffs have no title to the minerals on the property.
The land in question is situated in the Columbia Basin in central Washington. This vast area, comprising some two million acres, is now being partially irrigated by the Columbia Basin Project of the Bureau of Reclamation. The Grand Coulee Dam on the Columbia River is the principal structure in a complex of dams, reservoirs and canals designed to carry water to the irrigable portions of the basin. The function of O’Sullivan Dam, a part of the aforementioned project, is to impound waters in the Potholes Reservoir. The site of the Reservoir was a natural depression into which surface waters of the basin drained before flowing into the Columbia River through Lower Crab Creek. O’Sullivan Dam was built at the lower end to hold the waters in the reservoir.
*537 The site for the dam was selected after exhaustive geological investigation. Every effort was made to make the base of the dam watertight so as to prevent leakage or seepage on the downstream side. A mixture of cement and water was pumped into holes drilled from 35 to 110 feet deep into the bedrock forming the base of the dam, to seal off any cracks, fissures, or interflow areas which might be contained in the deep basalt rock formations. The dam itself is earth-filled, but there is no claim that it was improperly designed or constructed. Nevertheless, it is a fact that plaintiffs’ land was flooded after the dam was constructed and the waters impounded, as more fully stated hereinafter.
Plaintiffs’ land is located approximately one mile below the dam, and approximately one and three quarters miles west of Crab Creek. It is situated within one of the many coulees or gorges of the Drumheller Channels, which were cut out centuries ago by glacial waters. During prehistoric times there were flows of tremendous volumes of glacial water and ice over the Columbia Basin which gouged out huge channels and in some places left huge, undrained depressions. The Drumheller Channels were formed in this manner and one of the' undrained depressions was called Sulphate Lake, sometimes erroneously referred to as Sodium or Soda Lake. A larger area, which includes Sulphate Lake, is now called Corral Lake. Because of deposits of sodium sulphate contained therein, plaintiffs’ property bears the name “Sulphate Lake.”
Eor many years prior to the inundation herein complained of, this land was completely dry during the summer months, although it accumulated from one to two feet of water during the remainder of the year. Thus it was possible to enter upon the property, and to mine the sodium sulphate deposits during the periods in each year when the lake bed was dry, but plaintiffs have never regularly conducted mining operations.
1. We think the proof shows that the flooding of plaintiffs’ property was caused by the erection of the dam.
Defendant knew that the impounding of the waters above the dam would probably cause the property below the dam to be inundated. This is evidenced by the fact that it went *538 to great pains to prevent the water from seeping through it. But, whatever precautions were taken, the land was flooded nevertheless. Since the land was in fact taken, whether or not defendant endeavored to prevent this, defendant is liable to pay just compensation, if defendant’s act of building the rlam was the cause of the taking. Defendant’s liability depends not on its want of care, but on the fact of taking as the natural consequence of defendant’s acts.
As far back as 1906, at least from 1916 until the time the dam was built, Sulphate Lake was covered with only one to two feet of water during the winter months, which would dry up about June of each year until rains commenced in the fall. O’Sullivan Dam commenced to impound water in 1949; by 1952, after the reservoir had filled and created a head of pressure against the dam, the plaintiffs’ property was inundated to a depth of 10 feet; by June 4,1955 it had become flooded to a depth of 42 feet.
The evidence shows that part of these flood waters, at least, came from new springs or streams which broke through the ground between the dam and plaintiffs’ property, presumably caused by the pressure of the waters above the dam on underground waters, or caused by the escape of the impounded waters through crevices and underground channels. The floor of the reservoir behind the dam, just north of it, ranges from 980 to 1,020 feet, whereas the floor of Sulphate Lake is 892 feet, or nearly 100 feet lower than the lowest elevation of the floor of the reservoir. Any water that might have escaped from the reservoir naturally drained into Sulphate Lake.
There is testimony to the effect that the water table has been raised as a result of the entire Columbia Eiver Project, but this would not absolve defendant, nor is this sufficient to account for a depth of 42 feet of water on plaintiffs’ property.
We think the facts herein clearly indicate that the flood waters now on plaintiffs’ land are the result of the impounding of great quantities of water behind O’Sullivan Dam that have found their way either under or through the dam and onto plaintiffs’ property. Cf. Cotton Land Co. v. United *539 States, 109 C. Cls. 816; United States v. Kansas City Life Inswrance Co., 339 U. S. 799, affirming 109 C. Cls. 555.
2. Plaintiffs’ suit is based upon the destruction of the value of the mineral deposits on their property. Defendant says plaintiffs by their tax deed acquired no title to the mineral deposits on the land, and, therefore, are not entitled to damages for the destruction of them.
Plaintiffs obtained title to the lands that were flooded under a tax deed. The property was put up for sale by the State of Washington to satisfy its claim for unpaid taxes. It was bought in by plaintiffs on November 3, 1943 for the sum of $6.45. This was paid for the entire property. Under it plaintiffs acquired all interests in the land, surface and sub-surface, including mineral rights, as appears from the following:
Prior to 1921 there had been no effort by the owners to separate the mineral rights in the property from other rights in it, but in 1921 Drumheller, the owner of the entire fee, purported to convey the mineral rights therein to one Donaldson. Three years later Donaldson transferred his rights in the property to a company of which he was president, the Basic Eesources Company. After another three years, this company transferred, not only the mineral rights, but the entire fee to another company, of which Donaldson was president, the International Chemical Company. This company subsequently conveyed the entire fee to the property to Donaldson individually. Donaldson thereafter transferred an undivided one-half interest in the entire fee by separate deeds to J. D. Hull and A. M. MacDonald, who, on the tax assessor’s books, were the owners at the time the property was sold for taxes.
From the foregoing, it appears that Hull and McDonald acquired the right to mine the minerals on the property. Although the deed to them was a deed not only of the mineral interests but also of the fee, there is some doubt that they thereby acquired title to the property in fee simple. However, they and their predecessors in title had held the property under color of title probably long enough to have acquired title by adverse possession. But, be this as it may, the property was assessed on the tax assessor’s books as an *540 entirety; the mineral interests were not assessed separately. The proceedings to enforce the tax lien were proceedings to foreclose all rights in the property and to vest the property in fee simple in the purchaser at the tax sale. The tax deed to plaintiffs was a deed to the property in fee simple, and the purchaser thereunder, in our opinion, acquired title to the property in fee simple, because the lien of the State of Washington for taxes was a lien on the entire fee and was superior to the rights of all other persons claiming an interest therein.
But, in any event, at the time of the tax sale, Hull and MacDonald, who were the record owners of the property on the books of the tax assessor, did then own the right to extract minerals from the property. The purchaser at the tax sale, therefore, at least acquired the right to extract the minerals therefrom. It is for the destruction of this interest that plaintiffs sue.
It would seem, therefore, that plaintiffs have the capacity to maintain this suit, whether or not defendant may be correct in saying that the mineral interests should have been assessed separately.
3. The next question is the value of the property taken.
As stated, plaintiffs acquired the property for $6.45.
From 1896 to the date of the trial of this case there has been no sale of minerals extracted from this property, except for some inconsequential “spot” sales.
There were extensive sulphate deposits on the land, although it is doubtful whether it was sufficiently pure for commercial use. But, whatever the amount of the deposit, it could be mined, before the flooding, only for a few months during the summer. Thus the owner was unable to furnish sulphate continuously throughout the year, and a constant source of supply is essential to the users of sodium sulphate. On the other hand, there are a number of sources in this general region that have an unlimited supply of this product. This makes it very doubtful that plaintiffs could have found a market for their product even if they could have mined it. At any rate, neither Donaldson from the time he first acquired an interest in the property in 1916, nor his successors in title have ever found a market,
*541 The value of plaintiffs’ interest was inconsiderable. The Commissioner of this court has found a value of $2,500. This seems to us just, both to plaintiffs and defendant. Judgment for this amount will be rendered together with interest at four (4) percent per annum as a part of just compensation from December 5, 1952 until date of payment.
It is so ordered.
Fahx, Circuit Judge, sitting by designation; MaddeN, Judge; Littleton, Judge; and JoNEs, Chief Judge, concur.
FINDINGS OF FACT
The court, having considered the evidence, the report of Commissioner Currell Vance, and the briefs and argument of counsel, makes findings of fact as follows:
THE PROJECT
1. The Columbia Basin Project of the Bureau of Reclamation is situated centrally in the State of Washington. It covers an area roughly 80 miles long, north and south, and 60 miles wide, east and west, containing approximately 2,000,000 acres, of which about 1,000,000 acres are irrigable. Whereas the area is called a basin, it is in fact more in the nature of a plateau which was formed by a series of basalt flows.
2. The Columbia Basin Project was originally conceived sometime prior to 1910 as a means of delivering irrigation water to potential water users throughout the basin area who had found dry farming methods impractical because of inadequate rainfall.
3. A study was conducted during the period of 1920 to 1930, and a feasibility report, dated January I, 1932, was submitted by the Chief of Engineers to the Commissioner of the Bureau of Reclamation, Bureau of Reclamation Project Feasibilities and Authorizations.
4. The principal structure of the project is a dam in the Columbia River, a navigable stream. This dam is located near the head of what is known as the upper Grand Coulee. The dam itself forms- a barrier to raise the normal water surface in the Columbia River some 350 feet. It produces a head which is capable of being used for the generation of *542 electrical energy. Some of the electrical energy generated is used to drive pumps installed at Grand Coulee Dam for the purpose of raising the water from the reservoir behind the Grand Coulee Dam 280 feet up into the head of upper Grand Coulee.
5. The water thus pumped is initially placed in the equalizing reservoir constructed in the upper Grand Coulee, to be' used for irrigation purposes. The equalizing reservoir was created by building two earth dams, one known as North Dam, which is only a mile and a half to two miles from the Grand Coulee Dam, and which keeps the water from running back into the Columbia Biver after it has once been pumped up into the Grand Coulee, and the other dam, called the Dry Falls Dam or South Dam, which is located approximately 27 miles down the Coulee from North Dam, near the location of Coulee City, and whose purpose is to keep the water from running over what is known as Dry Falls into the lower Grand Coulee. North Dam is approximately 130 to 140 feet high. Dry Falls Dam or South Dam is approximately 75 feet high and a mile and a half long.
6. During the years 1941 to 1943, the Bureau of Beclamation considered as many as 15 different plans or systems of canals to serve the Columbia Basin Project. It appeared that there had once been a natural reservoir in the middle portion of the project, which is now the Potholes Beservoir. The land within the Columbia Basin Project naturally drained toward the center of the project area to form a common watercourse and it thence flowed in a westerly direction to return to the Columbia Biver by way of Lower Crab Creek. Part of this natural drainage followed a geological drainageway into what is called Drumheller Channels, and thence into Lower Crab Creek.-
7. The project contemplated the construction of a dam across this central drainageway to provide for the recovery of large amounts of return flow not otherwise used con-sumptively in the irrigation of lands in that drainage basin. This recovery reservoir would serve two functions: first, it would save the construction of hundreds of miles of canals by recapturing the water in the center of the area for redistribution, and second, and more important, it would capture *543 waste and return flow waters and surface waters and make them available for reuse and thus save the cost of pumping additional waters out of the Grand Coulee Dam Reservoir.
8. In order to select the best location for a dam site for the centi’ally-located recovery reservoir, extensive geological exploration was conducted. The geological exploration demonstrated that the project area situated within what is called the Columbia Plateau was underlain by a series of basalt flows deposited as layers. The entire thickness of the series of flows would extend to a depth of more than 5,000 feet. Following the deposition of these larger flows, there was a folding and-a faulting in this area. This created the Frenchman Hills, which form the southern end of the saucer-shaped basin called Quincy Basin. The Drumheller Channels were cut through the east end of these hills and it was through these channels that water could flow south. In this basin were deposited layers of material now identified as sandstone, siltstone and mudstone. Later, in the Ice Age, the Columbia River was dammed up time and again near the present location of the Grand Coulee Dam and the floods of melting glacial ice and snow were forced out over the plateau. These tremendous flows of water removed the soil and gouged channels into the basalt rock. Some of the early flood waters cut the Grand Coulee; thereafter, the waters flowed through the Grand Coulee to spread out over the northern part of the Columbia Basin in the saucer-shaped structural basin called Quincy Basin. There were three outlets for this water, two of them were by high level overflow thresholds down into the Columbia River, and the third was through what is called the Drumheller Channels. Because these channels were cut by a tremendous volume of water, the erosion was so great that when the water supply was cut off it left huge, undrained depressions.
9. A series of tests were made to determine the most satisfactory and economical site for the location of the dam called O’Sullivan Dam, which would impound water in the recovery reservoir. Diamond drill holes were drilled into the basalt along three separate sites under consideration as possible locations for O’Sullivan Dam. The first site, No. 1, was directly across the Drumheller Channels and, because of con *544 struction problems, it was abandoned. Investigation of No. 2 dam site disclosed the presence of an underground fault or fold called the Lind Coulee Flexure. It appeared that during recent geological time, one of the basalt flows had flexed or folded upward on an east-west axis to form a natural ground water dam extending roughly across the Drumheller Channels. This condition was determined to exist by study of the formation as revealed by the cores from the drill holes. Also, it was found that there was high artesian water pressure on wells drilled north of the fold, whereas there was- no artesian water pressure on wells drilled immediately south of the fold. Therefore, it appeared that an underground water pressure was building up behind the groundwater dam on the north of the flexure, whereas no water pressure existed south of the fold. The third dam site, which was the one finally selected, utilized the location of the Lind Coulee Flex-ure and curved to the south to tie hito the easterly flank of the Frenchman Hills as a natural abutment of the dam. It was thought to be an unusually favorable site. The final location of the dam site was determined by a review board from the Denver office of the Bureau of Eeclamation, which made recommendations to the Chief Engineer.
10. The design and specifications for the construction of the dam were developed by the Bureau’s Chief Engineer’s office in Denver. The dam was originally known as Potholes Dam until the name was changed by act of Congress to O’Sullivan Dam. The structure is Sy2 miles long, with a maximum height of about 200 feet. The maximum designed water surface for the dam is elevation, 1,055 above sea level. The dam contains about 9,000,000 cubic yards of material and was built by a joint venture of several private construction firms for about $9,500,000. The bids were opened in August 1946. The notice to proceed with the work was issued January 2, 1947. The dam was completed in August 1949.
11. The dam was constructed by digging a 50-foot wide cutoff trench down to bedrock. A series of grout holes were drilled in the bedrock and grout, which is a mixture of cement and water, was pumped under high pressure into the grout holes in the effort to seal off all the crevices in the *545 bedrock, and in effect to make a watertight curtain in the bedrock below the foundations of the dam, to prevent seepage of water underneath the dam. The specifications for the grouting provided for the pressures to be used in forcing the grout into the bedrock and prescribed the size of the holes. However, the spacing of the holes was directed by the authorized Government representative on the site, due to the fact that different conditions were encountered in each of the separate locations. The program of grouting provided for the drilling of holes at 20-foot intervals to a depth of 35 feet; at 60-foot intervals to a depth of 60 feet; and at 120-foot intervals to a depth of 110 feet. The holes were drilled with a diamond drill and the cores were removed and examined to determine the materials and whether there were any cracks and broken rocks or interflow zones. After the cores were examined, water was pumped into the holes to determine the rate at which the holes would accept grout. Grout was mixed at a 5 to 1 ratio — 5- cubic feet of water to 1 cubic foot of cement. The grout was inserted into the hole for about 15 minutes. If the hole accepted grout at an excessive rate of speed, the ratio of cement to water was increased. If the hole continued to accept grout in unlimited quantities, the mixture of grout was reduced to as low as half a cubic foot of water to one cubic foot of cement, making a grout almost the consistency of toothpaste. This mixture was used only when it was necessary to fill up a large hole below the rock surface. Grout was applied under pressure. If the hole did not accept appreciable amounts of grout, it was determined that the underground structure was relatively watertight. Then a grout hole would be drilled between the last two grout holes and additional grout would be injected to be sure that the cracks in the subsurface were filled. If the hole took a reasonably large quantity of grout, another hole would be drilled within a distance of 20 feet in order that the grout curtain might be extended between the two holes. If this hole accepted a quantity of grout, holes would be drilled within 10 feet on either side or even as close as 1 or 2 feet distant, in the effort to make sure that a continuous grout curtain existed beneath the rock foundation of the dam.
*546 12. The grouting was accomplished by the procedures generally adopted and prescribed for this operation, but as appears below, it may hare been unsuccessful in effecting a watertight seal of the foundation under the dam. The program of grouting, in an endeavor to make the foundation of O’Sullivan Dam watertight, did not include the floor of Potholes Reservoir.
13. After the grouting was completed, a zone of impervious earth material was laid in the cutoff trench. This material consisted of a mixture of clay, silt and sand, which, when thoroughly mixed, was the least pervious material available. This material was dampened to optimum moisture content and laid in the cutoff trench in windrows, leveled with a bulldozer to a thickness of about 9 inches, and thoroughly mixed and remixed with a disc and scarifier; after which it was tamped with a sheep’s-foot roller 12 times until the 9 inches of loose material was packed to a zone about 6 inches thick. Thereafter, the operation was repeated, thus building up the dam structure layer upon layer. There was a second zone which was composed of slightly more pervious materials and laid on each side of the center zone. Beyond zone No. 2 was zone No. 3, which was made up of very per-vious materials consisting of gravel and broken rock, which were laid on the exterior immediately under the riprapping. Zone No. 2 was laid in much the same fashion as that used in laying the impervious material. Zone No. 3, being of coarser material, was settled by sluicing with high pressure streams of water continuously during the placing process. Riprap-ping was placed over zone No. 3 to prevent wave action on the upstream side of the dam facing the reservoir and to prevent wind action on the downstream side of the dam structure.
14. The spillway for the dam was constructed so that the water would flow down Crab Creek Channel. Crab Creek Channel is a mile and a half to a mile and three-quarters east of plaintiffs’ property.
15. The dam was constructed in accordance with the customary and accepted methods for an earthfill dam. The reservoir formed by the dam is called Potholes Reservoir. The closure of the dam was made in 1949.
*547 16. There are now completed 260 miles of main canals and 15000 miles of laterals to deliver the irrigation water to some 300,000 acres of land.
THE LAND
17. The suit is for the value of certain land which plaintiffs claim was taken by defendant by its inundation by waters escaping under or through O’Sullivan Dam, and flowing upon the land claimed by plaintiffs. Said land is located about one mile below the dam and is described as follows:
Commencing at a point 1,922 feet south of the northwest corner of Section 15 in Township 17, north of Range 28, E. W. M., and running thence east 660 feet; thence south 1,320 feet; thence west 660 feet; thence north 1,320 feet to the point of beginning.
18. Said land, together with other land not material herein, was originally patented to the Northern Pacific Bail-way Company by patent dated January 3,1896.
19. The Northern Pacific Bailway Company conveyed all of Section 15, together with other lands, to T. S. Blyth by deed dated June 8,1897.
20. Thomas S. Blyth conveyed all of Section 15 and other lands to George Drumheller by deed dated October 25,1905.
21. George Drumheller and Anna M. Drumheller, his wife, conveyed an undivided one-third of Section 15 and other lands to F. S. LeGrow by deed dated October 25,1905.
22. F. S. LeGrow reconveyed the one-third interest in Section 15 and other lands to Drumheller by deed dated October 19,1907.
23. A Mr. Donaldson filed a Notice of Location of a Placer Claim on January 5,1916, covering the salts and other valuable minerals in the subject property.
24. Mr. Donaldson learned that title to the minerals went with the property, and therefore his placer claim was ineffective.
25. Thereafter Mr. Donaldson secured an agreement with the landowner, Mr. Drumheller, to mine the salts on the property, but the agreement was not witnessed or recorded, and was not a legal transfer.
26. In 1921, Mr. Donaldson secured a “Special Deed” from George Drumheller and wife, which deed bore $2 in can *548 celed documentary stamps, was recorded on page 242 of Book 28 of the records of Grant County, Washington, and purported to convey the mineral interest, including borax and other minerals, but excluding the right to bore or prospect for oil or minerals at a depth of more than 100 feet from the surface.
The pertinent language of that deed reads as follows:
The parties of the first part, for a valuable consideration to them in hand paid by the party of the second part, have, and hereby do, sell, remise and forever quitclaim unto the said second party, their heirs and assigns, the right to go upon the hereinafter described premises and to extract from the surface of the ground all mineral deposits, including borax and other salts, and to remove the same therefrom. This privilege shall not be construed to grant to the party of the second part any right to bore or prospect for oil or minerals at a depth of more than 100 feet from the surface. The land affected hereby and upon which the said rights are granted is the following described premises in Grant County, State of Washington, to-wit: * * * intending hereby to convey that part of said Section 15 upon which a part of the Sulphate Lake is located, and being all the land in Section 15 over which the said Lake extends.
To have and to hold the said rights to the said premises unto the said party of the second part, their heirs and assigns forever.
27. P. L. Donaldson and Stella I. Donaldson, his wife, by deed dated March 3, 1924, bearing $20 in canceled documentary stamps, purported to convey the mineral rights to Basic Kesources Company.
28. Basic Besources Company, by deed dated March 22, 1927, executed by P. D. Donaldson, president, and Stella I. Donaldson, secretary, purported to convey and warrant the land to International Chemical Company. This deed is the first deed after the purported conveyance to Donaldson in 1921, which recites a conveyance of the particular land described without restricting the estate to the right to go upon and extract minerals, including borax and other salts, from the surface. It was drafted by Mr. Donaldson’s attorney to satisfy the demands of the grantee.
29. International Chemical Company, by deed dated May 27,1927, executed by P. D. Donaldson, president, and Chas. *549 A. Jensen, secretary, purported to convey and warrant the same lands to Paul D. Donaldson, being the same person who signed as president.
30. P. D. Donaldson and Stella I. Donaldson, his wife, by deed dated February 26,1930, purported to convey and warrant an undivided one-half interest in the lands described to J. D. Hull.
31. P. D. Donaldson and Stella I. Donaldson, his wife, by deed dated April 30, 1930, purported to convey and warrant an undivided one-half interest in the lands to A. M. MacDonald. Mr. J. D. Hull and Mr. A. M. MacDonald died subsequent to the dates of the conveyances.
32. The property has been taxed from 1921, when it was owned in fee by Drumheller, to date, without regard to separating the mineral estate from the fee.
33. The property was foreclosed for nonpayment of taxes for a period of more than five years. The judgment of foreclosure, dated November 3,1943, purported to be against the property of A. M. MacDonald and J. D. Hull, but did not describe the estate foreclosed as a mineral estate.
34. Plaintiffs paid $6.45 for the property. Plaintiffs took a deed to the property described in the tax foreclosuure on November 15,1943.
SULPHATE LAKE
35. As described above, during prehistoric times there were flows of tremendous volumes of glacial water and ice over the Columbia Basin which gouged out huge channels and in some places left undrained depressions. The Drumheller Channels were formed in this manner and one of the un-drained depressions was called Sulphate Lake, sometimes erroneously referred to as Sodium or Soda Lake. A larger area, which includes Sulphate Lake, is now called Corral Lake.
36. Sulphate Lake is situated partly on plaintiffs’ land and partly on Section 16 lands.
37. Before the construction of O’Sullivan Dam and Potholes Reservoir, Sulphate Lake accumulated two or more feet of water during the winter season from rains and melting snow, but during the dry season the bed of the lake would usually dry up by evaporation until the sodium sulphate *550 could be bench mined. The date such an operation could be commenced depended upon the weather conditions of the particular year. Usually the mining operation was confined to a period from late in June up until the date of the September or November rains.
THE ELOODING OP SULPHATE LAKE
38. The defendant began impounding water in Potholes Reservoir northerly of and behind said O’Sullivan Dam early in 1949.
39. The elevation above sea level of the surface of the water in Potholes Reservoir behind O’Sullivan Dam on various dates between November 1951 and January 1956, follows:
End of November 1951_ 960. 7 feet
April 30,1952_ 992.4 “
June 30, 1952_ 1002.2 “
December 31, 1952_1019.4 “
December 31, 1953_ 1027.0 “
July 1, 1954- 1017. 2 “
December 31, 1954_ 1024.4 “
December 31, 1955_ 1033.3 “
40. The elevation above sea level of the floor of Potholes Reservoir in the westerly portion, just northerly of O’Sullivan Dam, ranges from 980 to 1020 feet.
The elevation above sea level of the crest of O’Sullivan Dam is 1059 feet.
The elevation above sea level of the floor of Sulphate Lake on the plaintiffs’ property is 892 feet.
41. From 1916 to 1951, and as early as 1906, the surface of the mineral deposit in Sulphate Lake, the property involved herein, was generally covered during the winter months by a foot or two of water. However, it would dry up by about June of each year so that the property could be mined and walked over during the summer and early fall months.
42. As late as August and November 1951, the said Sulphate Lake was not inundated beyond the normal foot or two.
Sulphate Lake was inundated beyond normal, to a depth of approximately 10 feet, by the fall of 1952, and to a depth of approximately 42 feet on June 4,1955.
*551 43. On June 4,1955, the surface of the water impounded in Potholes Eeservoir, behind O’Sullivan Dam, was 80 feet higher than the surface of that in Sulphate Lake.
44. The northerly boundary of plaintiffs’ Sulphate Lake property is approximately a mile southerly from O’Sullivan Dam.
45. Most of the waters which have inundated Sulphate Lake, the plaintiffs’ property involved in this suit, and adjacent areas below and southerly from O’Sullivan Dam, have originated from and come from Potholes Eeservoir, as a result of leakage or seepage either through the floor of the reservoir or the base of the dam, although some small part may have been the result of an readjustment of the water table beneath the surface of the ground, due to the construction of the Columbia Basin Project. Some of these waters may be traced to new streams which have emerged from the ground below the dam and above Sulphate Lake since the impounding of water in Potholes Eeservoir.
46. Sulphate Lake, and adjacent areas below O’Sullivan Dam, would not have been flooded if that dam had not been constructed and water impounded behind it.
47. The defendant claimed title to waters arising on its land immediately below the dam when the State of Washington attempted to gain the use of the land for its wildlife program. These waters are a portion of those which have inundated properties below O’Sullivan Dam, including plaintiffs’ property.
48. Although defendant’s grouting operation in the construction of O’Sullivan Dam was performed in accordance with sound and accepted procedures, defendant has been unable to prove that the grouting operation was successful and that a watertight seal was effected in the base of the dam.
49. In acquiring property for the construction of the dam, the defendant acquired not only that property which would comprise the dam site and the area to be inundated by the impounded waters, but also acquired ownership or control of all the property directly below the dam, with exception of plaintiffs’ property.
*552 VALUE OF PLAINTIFFS’ PROPERTY
50. The land comprising the 20 acres involved in this case, aside from Sulphate Lake, is grazing land of a rather poor quality, worth about $10 per acre. If the property has any substantial value, it must be on account of the sulphate deposit covering 9 acres. To arrive at such value it is necessary to consider the quantity of material in the lake, its composition, and its merchantability. The testimony submitted by the parties on these matters is diametrically in disagreement.
51. The plaintiffs claim that there are in the deposit anywhere from approximately 60,000 to 100,000 tons of material. Defendant’s estimate is from about 15,000 to 16,000 tons. The methods of exploration and estimation of both parties are to an extent inaccurate and inconclusive, but under the weight of the evidence, there are probably in the deposit 50,000 tons of sodium sulphate of sufficient purity for use, after it had been “beneficiated.” See findings 52 and 58.
52. The testimony as to composition of the deposit by the parties is likewise in conflict. Plaintiffs claim that the bulk of the deposit is a solid mass of crystals with a few pods or pans surrounded by clay on the surface. Defendant, on the other hand, claims that the entire deposit consists of such pods or pans, and that all of the material would have to be purified, or as the method is designated “beneficiated” before it could be used.
From the weight of the testimony plaintiffs’ description of the composition is more nearly accurate; substantial quantities of the deposit are in solid crystalline form. However, even so beneficiation of a considerable part of the deposit would be necessary to make it satisfactory to use.
53. The main market for sodium sulphate is with the kraft paper industry. It is used with sulphur to cook pulp. There was some limited use in the glass industry, but the local glass industry does not use it. It is also used in limited quantities for tanning hides and pharmaceutical purposes.
54. In the process of cooking the pulp in the kraft paper industry, the material used is recovered and more sodium *553 sulphate is added at the time it is ready for reuse in cooMng more pulp. It is necessary in the recapturing process to use pure or relatively pure sodium sulphate. Any appreciable quantities of clay or mud in the salt cake might cause the refining plant considerable trouble in recapturing its “cooking liquor.” Because of the fact that the whole plant operates as an integral unit, a breakdown in the recovery system would stop the operation of the entire mill. Therefore, commercial purchasers in the kraft industry would not knowingly use a material which was not pure or beneficiated because the system cannot tolerate any appreciable amounts of clay.
55. If the owner of a new and small source of sodium sulphate offered its product to a well-established kraft mill operator, considerable investigation and testing would be made before a contract could be agreed upon. Most of the kraft plants would use about 5,000 tons of sodium sulphate a year. When a kraft manufacturer is looking for a source of supply of sodium sulphate, it requires a constant, reliable source, and would not be interested in a supplier who could operate only during the summertime. By constant and reliable is meant somewhere between 15 and 100 years’ supply. The kraft industry is very stable and looks to a long-range future. It is interested in only a long-range supply of sodium sulphate or some other chemical to take its place in the cooking process.
' 56. There are several suppliers of sodium sulphate who have what appears to be unlimited supplies of raw materials, e. g., Searles Lake, California; Great Salt Lake, Utah; Dale Lake, California, and many other extensive deposits.
57. The going price paid by the kraft industry for sodium sulphate of 97 percent purity f. o. b. source of supply, was generally $17 per ton.
58. In order for the sodium sulphate deposit on plaintiffs’ property in this case to be of commercial value, at least some substantial part of it would have to be beneficiated. It has been estimated that a plant to effect such beneficiation would cost up to a neighborhood of $100,000.
59. The most persuasive consideration bearing on the merchantability of the material involved, is that for the greater *554 part of 50 years it has been, owned, from time to time, by people interested in selling the material, and notwithstanding such fact only a small amount has been mined, and only a small part of that mined has reached a market.
CONCLUSION OP LAW
Upon the foregoing findings of fact, which are made a part of the judgment herein, the court concludes as a matter of law that plaintiffs are entitled to recover.
It is therefore adjudged and ordered that plaintiffs recover of and from the United States the sum of two thousand five hundred dollars ($2,500), together with interest at four (4) percent per annum as a part of just compensation from December 5,1952 until date of payment.